White Construction Company *v.* Arkansas-Louisiana
Highway Improvement District.

Opinion delivered October 22, 1923.

1. Contracts—construction.—Courts may acquaint themselves
   with the persons and circumstances that are the subject of the
   statements in the written agreement, and are entitled to place
   themselves in the same situation as the parties who made the
   contract, so as to view the circumstances as they viewed them
   and to judge of the meaning of the words and of the correct
   application of the language to the things described.

2. Highways—construction of maintenance bonds.—The com-
   missioners of a road improvement district adopted plans for the
   improvement and issued forms of proposals which were sub-
   mitted to prospective bidders, advising them that they would
   be required to execute maintenance bonds to guaranty all work
   for a period of five years and at the end of that period to "deliver
   the work in as good condition as when accepted, ordinary wear
   and tear excepted, without any additional allowance or compen-
   sation," and that "the cleaning of ditches. berms, slopes and
   waterways shall not be considered as defects to be corrected
   under the guaranty," and contracts were let accordingly.
   *Held* that, with the exceptions expressly mentioned, it was the
   intention of the parties that the work done under the contract
   should be delivered to the district in as good condition as when
   the work was completed and accepted.

Appeal from Chicot Chancery Court; *E. G. Ham-
mock*, Chancellor; affirmed.

*Winston, Strawn & Shaw*, and *Coleman, Robinson &
House*, for appellants.

To determine the meaning of the bond in this case,
reference must be made to the contract.    116 Ark. 212.
The bond does not guarantee the road, but only *all work
performed* by the contract, that is, materials and work-
manship.    The plans and specifications were not
guaranteed.    Unless specifically guaranteed, an interpre-
tation of a contract to so hold would be harsh, unnatural
and unfair.    For cases so holding see 113 N. E. 703; 54
N. E. 661; 73 Wis. 650.    Of course a contractor may
guarantee the plans themselves as in the case of 116 Ark.
212, but the court will not find such an absolute guaranty

unless plain and explicit language in the contract requires it. The following cases are directly in point: 196 Pac. 1091; 136 Minn. 288, 161 N. W. 593; 97 S. W. 1; 107 S. W. 244, 14 L. R. A. (N. S.) 1216; 41 N. W. 338.

*J. R. Parker* and *Rose, Hemingway, Cantrell & Loughborough,* for appellee.

In the last analysis the situation of the parties, what they did and the plain terms of the maintenance bonds, show the intent that the contractors should keep *all* of the work in repair and maintain it for a period of five years. If the bonds do not mean this, they mean nothing. Cases arising under similar bonds, where they have been construed to mean an absolute undertaking to keep in repair, are found as follows: 89 Ark. 95; 224 Fed. 842; 171 Fed. 29; 134 Ill. 203; 35 S. W. (Ky.) 1125; 38 S. W. (Mo.) 458; 101 N. E. (N. Y.) 162; 60 N. J. L. 394; 46 N. Y. 444; 29 App. D. C. 506. The case so strongly relied upon by appellant at 135 N. E. 702 did not contain a guarantee clause similar to the case at bar. There was no provision that, at the end of the five-year period, the work should be in as good condition as when completed—a feature on which the court commented in distinguishing the cases. The other cases cited by appellant are either not in point or are easily distinguished from the case at bar.

WOOD, J. The Arkansas-Louisiana Highway Improvement District (hereafter called appellee) instituted three separate suits, two against the White Construction Company and its surety, the United States Fidelity & Guaranty Company, and one against the Bryant Paving Company and its surety, the National Surety Company. The construction companies will hereafter be referred to as the appellants and the surety companies as the guaranty companies. As the suits are identical in purport, they were consolidated for hearing. The suits are on maintenance bonds executed by the appellants, pursuant to their respective contracts to construct certain portions of the road. The complaints alleged, in substance, that defects in the road work had

appeared in sections covered by the bonds, which the respective contractors and their sureties had failed to repair as required by the respective maintenance bonds; that demand had been made for such repairs, and that the appellants had failed and refused to make them. The amounts necessary to make the repairs in the respective sections and the amounts of the maintenance bonds covering such sections are set forth in the complaints.

The appellants, in their answer, admitted the defects complained of, and admitted that there had been a demand to repair, and that they had refused to do so because, as they alleged, none of the defects complained of were due to inefficient workmanship, or material supplied by them, but to unskilful and insufficient plans and specifications prepared by the engineer of the appellee. They further alleged that all the work was done by them in accordance with the plans and specifications, under the direction of the engineer of the appellee in charge of the work, and according to the method of construction called for by the contracts and directed by the engineer; that the contractors knew all the time that the plans were defective and that their deficiencies would eventually produce the very conditions which have developed, and that the contractors so advised the engineer of the appellee before and during the progress of the work. But the appellee did not change its plans, and the contractors were required by the engineer, as well as by the contracts, to carry them out to the letter.

The testimony in the record is quite voluminous, and was evidently taken with a view of placing the trial court as near as possible in the situation of the parties to the contracts and the maintenance bonds, in order that the court might construe them with reference to the precise situation and circumstances of the parties at the time the contracts were entered into in order to effectuate their intention in making them. Such of the testimony as we deem necessary will be set forth as we proceed.

The commissioners of the appellee were ten landowners in the district. They employed an engineer to

make plans and specifications for the work. They issued a circular letter containing general information to bidders for the work to be done under the plans and specifications, which included approximately one hundred and fifty-five miles of roadway in the district, divided into five sections, corresponding to the work in the counties embraced in the district. Among other things this circular contained the following recitals:

"All things herein contained, the proposal, plans, and general information for bidders, are hereby made a part of these specifications and contracts, and are to be considered one instrument. The intent is to make them explanatory one of the other. Should any conflicting statements be found, the bidder, or contractor, shall accept the interpretation of the engineer, whose decision shall be final and conclusive."

"No contract will be awarded except to responsible bidders capable of performing the class of work called for by these specifications. Bidders must examine carefully the plans, specifications and contract and proposal forms before submitting proposals."

"Bidders who have submitted proposals will be considered as having examined the location of the proposed work and as being familiar with the conditions to be encountered and with the requirements of these specifications."

This circular specified the kind of work that the plans and specifications contemplated in the respective counties. The foundation and wearing surfaces of certain types were specified for certain counties. For instance, for Chicot, Desha and Drew counties a mixed method asphalt wearing surface, of types designated "A," "B" and "C," was to be placed on either a cement concrete base, a roll-stone base, a bituminous roll-stone base, or upon a rock mac base. And it further recited: "A five-year maintenance guaranty will be required, including the foundations, as specified on types of wearing surfaces 'A,' 'B' and 'C,' and in case bidders do not desire to give such a guaranty on any of the foundations

specified, they will leave such base items blank as they do not care to guarantee with the surface laid thereon.''

The bids by the contractors were on printed forms of proposals, in which the contractors state that they have carefully examined the plans and specifications and form of contract to be entered into, and by personal examination and investigation had satisfied themselves of the nature of their obligations. These proposals showed bids on concrete headers and on four-inch concrete base and on five-inch concrete base and on the asphalt top. The proposals showed no bids on either the four- or five-inch ''roc mac'' base, on the five-inch ''roll-stone'' base, or either the four- or five-inch ''bituminous'' base. Nor did either proposal show a bid on type ''B'' or ''C'' wearing surface. There was a note in the proposals which stated that on the work in Desha, Chicot and Drew counties a five-year maintenance guarantee will be required on items 28, 29 and 30, types ''A,'' ''B'' and ''C,'' as also will be required on items 21 to 27 inclusive. It was further stated in the proposal: ''Price bid for items 28, 29 and 30 contemplates the use of Trinidad Lake asphalt, and includes maintenance guaranty for five years.'' The proposal for work in Lincoln County was for water-bound trap rock macadam, and in Ashley County for gravel macadam, and covering the work in these counties a bond containing a maintenance guaranty of one year was required. Work done in Lincoln and Ashley counties was not involved in this controversy, but the difference in the character of the work in those counties and the maintenance bonds required for that work is mentioned, because it throws some light on the correct interpretation of the contracts and bonds here under review. With the information contained in the above circular and proposal form, the appellee and the appellants entered into contracts for the construction of the work, and the appellants executed the bonds upon which these actions are based. We will not set forth all of the

contracts and bonds in detail, but will give in substance such of their provisions as we deem pertinent.

The contractors were required to furnish the material, equipment and labor, and to construct certain roads (describing them) according to plans and specifications prepared by the appellee, for the price named in the proposal for contracts. The work was to be completed in approximately five-mile sections, as designated by the engineer of the appellee. The retained percentages were to be paid to the contractors on their completing such sections of the work, and on their furnishing a maintenance bond, on the terms provided in the specifications for such completed sections. The payment of the retained percentages and the giving and acceptance of the maintenance bonds did not constitute an acceptance of the work as having been done in accordance with the specifications, but the acceptance was to be postponed until final acceptance of the entire work. There was a provision in the contracts to the effect that the contractor was to do the work in exact accordance with the plans and specifications, under the supervision of inspectors and assistant engineers employed by the engineer of the appellee, and any deviation from the plans and specifications was sufficient cause for suspension of the work if the engineer so desired it. The engineer was to determine all questions in relation to the work and the construction thereof. The contractors guaranteed all work from date of acceptance by the board and engineer for a period of one year, except on such road improvements as their proposal and contract provided for a guaranty of five years. The cleaning of ditches, berms, slopes and waterways was not to be considered as defects to be corrected under the guaranty. Contractors were to repair any inequalities, settlements, or other unsatisfactory conditions that might occur in any portion of the work. If the contractor failed to make repairs within the time specified by the board in writing, the board had authority to make the repairs and charge the expense thereof against the surety bond given the

board by the contractor. Before the final acceptance of the work, at the end of the guaranty period, an inspection was to be made of the entire work. If disintegration, depressions, or other defects existed in the work under guaranty, such portion or portions were to be repaired to the satisfaction of the board by the contractor and at his expense. In the original specifications showing the stipulations as to repair work, "cracks" were included, but the testimony shows that the word "cracks" was eliminated from the specifications before the contract was signed, and was not therefore embraced in the contract or maintenance bonds. The contractors were to supply all necessary materials and do all necessary work, and, at the end of the specified period, "deliver the work to the appellee in as good condition as when accepted, ordinary wear and tear excepted, without additional allowance or compensation." A maintenance bond was required in the sum of 25 per cent. of the contract cost for the making of the repairs for the period of one or five years, as specified in the contract. The bonds were to be furnished the board at the time of the payment of the final estimate and before the final payment was made to the contractor. The maintenance period could be dated from January 1 for all work completed in the previous calendar year.

The appellants performed the work under their contracts, in accordance with the plans and specifications, under the inspection and supervision of the engineer of the appellee and his assistants, which work was approved by him and accepted by the appellee. On the completion of each five-mile section, maintenance bonds, as required by the contracts, were executed by the appellants and the guaranty companies. The guaranty companies were paid a money consideration for executing the bonds. These bonds recite the inducements and conditions upon which they were executed, following closely the provisions of the contract above referred to. The bonds contained a provision to the effect that "the said contract and specifications thereunder are expressly

referred to as showing the true intent and meaning of this obligation.'' All bonds contained the same provisions, except the bonds of the appellant Bryant Paving Company, which contained the additional provision that any damage done to the completed work by flood waters from the Mississippi River is not within the obligations of its bond. The bonds conclude with a paragraph to the effect that, if the construction companies should well and truly perform the provisions of their contracts, as set forth in the bonds, in regard to the maintenance of said work and the repairs thereunder, for a period of five years beginning October 10, 1921, and ending five years thereafter, then their obligations should be void, otherwise to remain in full force and effect. Rights of action under the bonds were to accrue and be enforceable immediately at any time the construction companies failed or refused to comply with the obligations of their bonds.

Much testimony is brought into the record concerning the issue as to the defects in the improvement and the causes thereof, but this testimony it is unnecessary to set forth and discuss in detail. Suffice it to say that, so far as appellants are concerned, they introduced testimony tending to show that the defects in the improvements were caused not by faulty construction, but because of defects in the plans and specifications prepared by the engineer of the appellee. At the conclusion of the testimony the court entered decrees in favor of the appellee against the appellants for substantially the amounts claimed in the respective complaints, from which decrees are these appeals.

1. In *Wood* v. *Kelsey,* 90 Ark. 272-277, we said: ''Courts may acquaint themselves with the persons and circumstances that are the subject of the statements in the written agreement, and are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them and so as to judge of the meaning of the words and of the correct application of the language to

the things described." Applying this important principle to the facts of this record, we find here that the commissioners of the district were ten landowners, who, under the law, were intrusted with the duty of constructing a great improvement, which, as the record shows, involved an expenditure of a little more than two and a half million dollars. The board employed its engineer to prepare the plans and specifications, and when this was done it advertised for bids and issued forms of proposals on which the contractors were to make the bids. The bidders were advised that they must examine carefully the plans, specifications and contracts, and proposal forms, all of which were made a part of the contract, before submitting their bids, which were to be submitted on the written forms for proposals issued by the board. By these proposal forms bidders were advised that a five-year maintenance guaranty would be required on certain types of asphalt surface, designating these types by the letters A, B and C, in items 28, 29 and 30 of the proposal forms, when laid on any of the rock, bituminous, or concrete bases described in items 21 to 27 inclusive. These items designated the specifications for the different bases, items 21 and 22 being respectively 4- and 5-inch concrete base, items 23 and 24 being respectively 4- and 5-inch roc mac base, item 25 being 5-inch roll-stone base, and items 26 and 27 being respectively 4- and 5-inch bituminous base, each in place, per square yard.

The bids sent in by the appellants showed that they carefully examined and discriminated between these different types of surface and base. They were willing to bid and execute maintenance bonds on their work if the asphalt was of type "A" and laid on either a 4- or 5-inch concrete base, as specified in items 21 and 22. But they were not willing to bid and execute maintenance bonds if the asphalt surface were of the types "B" and "C" and bases of roc mac, roll-stone, or bituminous. Bidders were advised in the proposal forms that the bids on the asphalt surface also included maintenance

guaranties for five years, and there was testimony in the record to the effect that there was an added price of five cents per square yard in the bids for asphalt surface to cover the cost of the five years' maintenance.

The commissioners of the district employed an engineer to prepare the plans and specifications, which was done in the most minute detail, and seemingly every precaution was taken by them to complete the improvement in a manner that would insure a road of very high type, at least in the counties of Desha, Chicot and Drew. They doubtless contemplated that maintenance bonds executed for the preservation of the work as thus completed under the plans and specifications would insure the permanency of the project, and show that the contractors had, in good faith, carried out their contracts and completed the improvement as was intended by the parties to the contracts. It is but reasonable to conclude that the commissioners, as landowners of the district, did not have that minute special skill and experience in such undertakings as would enable them to determine whether the plans and specifications, if followed, and the terms of the contracts, if fully complied with by the contractors, would produce the results they contemplated. On the other hand, the magnitude of the undertaking was such that none but skilled and experienced contractors would have entered upon a task involving the outlay of so much money and the tremendous financial obligations incident thereto. The commissioners might not, and doubtless did not, know whether there would be defects of the character shown in the construction work when done under the plans and specifications, and necessarily had to rely in these particulars upon the ability and judgment of their engineer and his assistants. But the contractors, from their observation and experience in such matters, would know whether the faithful execution of the work according to the plans and specifications would result in the useful and enduring improvement which, they must have known, was contemplated by the commissioners.

Such is the situation, and such were the circumstances of the parties at the time they entered into the contracts and used the language of the guaranty clause as follows: "The contractor guarantees all work performed under these plans and specifications and contract for a period of one year from the date of acceptance by the board and engineer, except on such roads as his proposal and contract provide for a guaranty period of five years. The cleaning of ditches, berms, slopes and waterways shall not be considered as defects to be corrected under the guaranty. The contractor shall repair any inequalities, settlements or other unsatisfactory conditions that may occur or develop in any portion of the work performed by him, and do all necessary work, and, at the end of the specified period, shall deliver the work to the district in as good condition as when accepted, ordinary wear and tear excepted, without any additional allowance or compensation." And further: "Should the contractor fail to make repairs of unsatisfactory work, the board shall have the authority to have same made at contractor's expense." And again: "Just previous to the expiration of the guaranty period an inspection shall be made of the entire work, and if disintegrations, depressions, or other defects exist in the work under guaranty, such portions shall be repaired immediately," etc.

It will be observed that the contractor guarantees all work performed under these plans and specifications, and guarantees that, at the end of the specified period, he will "deliver the work to the district in as good condition as when accepted, ordinary wear and tear excepted." The contract mentions that the cleaning of ditches, berms, slopes and waterways shall not be considered as defects to be corrected under the guaranty.

While the question is by no means free from difficulty, we are convinced, after considering the above and the other language of the contract in its entirety, in the light of the situation and circumstances of the parties thereto, that it was the intention of the parties

that the work done by the appellants, under the plans
and specifications and contract, at the end of the
guaranty period should be delivered to the appellee in
as good condition as when the work was completed and
accepted by the engineer of the appellee, "ordinary wear
and tear" excepted. In short, it was the intention of
the appellee and the appellants that the latter should
do the work according to the plans and specifications,
and keep the work as thus done in the same condition
for five years that it was in when accepted by the
appellee, ordinary wear and tear excepted. This
necessarily refers to all work that was done by the
appellants, except the cleaning of ditches and other items
specified not to be considered as defects. The very
mention of these items that were not to be considered as
defects shows that all other defects, of the character
mentioned, except those caused by "ordinary wear and
tear," were to be considered as defects in the work and
as coming under the guaranty to repair.

Learned counsel for the appellants reason with much
plausibility that, while the above language was a
guaranty of the work performed, it was not a guaranty
of the plans and specifications; that it was a guaranty
of workmanship, but not of design. As one of the prin-
cipal cases to sustain their contention, counsel for
appellants rely upon that of *R. F. Conway Company* v.
*Chicago,* 113 N. E. 703. In that case the contract
provided, among other things, as follows: "As a
guaranty of the faithful performance of these specifica-
tions, the quality of the materials furnished, and the
proper construction of said improvement, the contractor
hereby agrees to keep and maintain said improvement,
without additional charge or cost to the city of Chicago,
in such order and condition as will be satisfactory to the
board of local improvements, for a period of five years
from and after the first day of December next following
the completion and acceptance of the same, which keep-
ing and maintaining shall include repairs or the entire
reconstruction of the same." In that case the contrac-

tors built a roadway or pavement along Lincoln Avenue in the city of Chicago. While the improvement was going on the street railway company laid a new track along the avenue, the railway gang going ahead of the construction gang that was laying the roadway and pavement. The construction company complied with all the plans and specifications, and there was no claim of any defective material. The work was done as directed by the city authorities, and was accepted and approved by them. The principal point decided is reflected by the syllabus, as follows: "Where a contractor for street paving, as a guaranty of faithful performance, agreed to maintain the improvement in satisfactory order for five years, the city designing the type of pavement and of the track construction in rehabilitating the street railway tracks, the contractor not being consulted in regard to either, such contractor was liable only for defects in the pavement resulting only from faulty character or quality of the materials used or the workmanship employed, and was not liable for defects caused solely by the operation of heavier street-cars than were used when the pavement was first laid, since a guaranty of the propriety of design or plan could not be inferred in the absence of clear expression in the contract."

In the course of the opinion the court said: "It is plain, from the uncontradicted testimony in this record, that at the time this contract was executed the experience of the men most expert in the construction of street-car tracks and in putting down this class of pavement was not of such nature as to make it possible for them to determine with any certainty whether the specifications for constructing this pavement or for rehabilitating the street railway tracks and right-of-way were of such a character as to prevent the injury to this pavement from the causes described in the record. The proof tends strongly to show that in 1907 no one connected with preparing or executing the contract and specifications had any reason to anticipate that the vibration of the

rails, caused by the heavier cars, would force the sand from the cushion to the surface, or into the depression caused by the sinking of the rails, or in heaps under the blocks. * * * In the light of the testimony in this record, we cannot see how the cause of this injury to the pavement could have been reasonably anticipated at the time the contract was entered into.''

It will thus be seen that not only the provisions of the guaranty clause of the contract in that case were entirely different from that of the case at bar, but the injury was of such a character that it could not have been reasonably anticipated. Construing the particular language of the guaranty clause in the above case with reference to the facts there stated, the court held that it was a guaranty only that the materials furnished and the workmanship were according to plans and specifications. In the case at bar the defects and injuries to the roadway were such as might have been, and were, in the reasonable contemplation of the parties at the time they entered into the contract, and the guaranty clause contains a guaranty not only of the materials furnished and of the workmanship in accordance with the plans and specifications, but it contains more. It is a guaranty of all the work as done under the plans and specifications, and that all work as thus done will be in as good condition at the end of the five-year period as it was when completed and accepted, except as to ordinary wear and tear. The language of the guaranty clause of the contract in the case at bar is tantamount not only to a guaranty of workmanship and materials, but that the plans and specifications, when complied with, would result in an improvement that would last for a period of five years and be in the same condition at the expiration of that period as it was when originally completed and accepted, ordinary wear and tear excepted. In order that this guaranty might be realized, the contractors convenanted that they would repair any ''inequalities, settlements, or other unsatisfactory conditions, disintegrations, depressions, or other

defects'' that may occur or develop in any portion of the work necessary to be done in order to place the work in as good condition as it was when completed and accepted by the appellee, excepting only such defects as the "cleaning of ditches, berms, slopes and waterways," and ordinary wear and tear. In other words, the effect of the guaranty clause, as a whole, was to guarantee the quality and durability of the improvement as completed under the plans and specifications, and to impose upon the appellants the obligation of making such guaranty good for a period of five years by making such repairs as were necessary to that end, ordinary wear and tear excepted. See *Osborne* v. *Lyons*, 73 N. W. 650.

It would unduly extend this opinion to review the other authorities cited to sustain the contention of learned counsel for the appellants in their excellent brief. We have examined them, and find that the differences in the wording of the guaranty clauses of the contracts, and other facts, are sufficient to distinguish all these cases from the case at bar. Each case, in the last analysis, must depend, for proper construction of the contract, upon its own particular facts. It occurs to us that the only correct interpretation that can be put upon the language of the guaranty clause of the contract in the case at bar, viewed in the light of the situation and circumstances of the parties, as evidencing their intention at the time the contracts were entered into, is that which we have given it. As supporting in principle this interpretation, see the following authorities cited in brief of counsel for the appellee: *Barber Asphalt Paving Company* v. *St. Paul,* 224 Fed. 842; *Akron* v. *Barber Asphalt Paving Company,* 171 Fed. 29; *Lake View* v. *MacRitchie,* 134 Ill. 203, 208, 25 N. E. 663; *Fahler* v. *Gosnell,* 35 S. W. (Ky.) 1125; *Barber Asphalt Paving Co.* v. *Ullman,* 38 S. W. (Mo.) 458, 463; *Cameron-Hawn Realty Co.* v. *City,* 101 N. E. (N. Y.) 162; *Wilson* v. *Trenton,* 60 N. J. 394, 38 Atl. 635; *Reilly* v. *Brooklyn,* 46 N. Y. 444; *McFarland* v. *Barber Asphalt Paving Co.,* 29 App. D. C. 506.

2. It follows from what we have said that the appellants violated the terms of their contracts and the obligations of their bonds in refusing to remedy the defects, and in failing to redress the resultant injury to the appellee of which it herein makes complaint. These defects were clearly within the contemplation of the parties. The appellants and the sureties on their maintenance bonds are liable for the amounts for which decrees were rendered in the chancery court. These decrees were correct, and they are affirmed.